Filed 12/11/14  In re Arianna D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Arianna. D. et al., Persons Coming Under the Juvenile Court Law. | D065446 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>TINA G. et al.,<br><br>        Defendants and Appellants. | (Super. Ct. No. SJ11357C-E) |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Taylor Buck Law and Toni Taylor Buck, under appointment by the Court of Appeal, for Defendant and Appellant, Tina G.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant, Francisco D.

Thomas E. Montgomery, County Counsel, John E. Philips, and Lisa M. Maldonado, Deputies County Counsel.

Tina G. (Mother) and Francisco D. (Father) appeal from juvenile court orders denying Mother's Welfare and Institutions Code[1] section 388 petition and terminating both parents' rights over their three children: Arianna D., A. D. and Antonio D. (§ 366.26.) Mother contends the juvenile court prejudicially erred by denying her section 388 petition, and finding that the "beneficial relationship" exception to termination of parental rights and adoption does not apply in this case. (§ 366.26.) Father concedes that he "did struggle with his drug addiction," but contends that "when he was sober he was a good parent." We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

On June 7, 2013, the San Diego County Health and Human Services Agency (Agency) filed section 300 petitions alleging that Arianna (then age 3); A. (then age 2); and Antonio (then age 1) came within the juvenile court's jurisdiction after police found a methamphetamine pipe and a makeshift bong in the hotel where they were staying, and arrested father for possession of drug paraphernalia and child abuse. The section 300 petition also alleged the parents have a history of drug use.

A social worker reported that on June 1, 2013, someone called a child abuse hotline reporting that the children were seen "on the streets with parents looking dirty and without shoes." The next day, police located the parents and children at a hotel. Father

---

[1]     Statutory references are to the Welfare and Institutions Code.

was "passed out" with an adult gang member who was a parolee. Mother was not there, but Arianna and Antonio were in the room. Mother later arrived at the hotel and took the children with her to an unknown destination. Three days later, police and the social worker found the parents and children at a different hotel. Mother's speech was slurred and she stumbled while walking. Father admitted using methamphetamine as recently as the previous Sunday. The hotel room was in disarray. The children were taken into custody and admitted to the Polinsky Children's Center.

The social worker noted the parents were unable to provide regular care for the three children and had previously failed to reunify with their two other children.[2] The social worker concluded that since the parents' first child was removed in September 2004, the parents had not completed any services or drug treatment programs, and had not shown an ability to provide a safe, stable and drug free environment for their children. The social worker recommended reunification services for the family and supervised visits between the parents and the children.

At a June 10, 2013, detention hearing, the juvenile court made prima facie findings on the petition. It ordered the children be detained in out-of-home care, the parents receive services, and that Agency allow the parents visits with the children.

---

[2]    A 2004 detention report regarding the termination of services for the parents' first child stated Mother had tested positive for methamphetamine and had received little prenatal care; the newborn child tested positive for methamphetamine. The parents were offered six months of services but failed to comply with their case plans; therefore, their services were terminated. The second child was born. In 2006 Mother again tested positive for methamphetamine. She did not thereafter participate in parenting or drug treatment programs; therefore, services were terminated for the second child. Both children were adopted by their paternal grandmother.

In a June 26, 2013 jurisdiction/disposition report, a social worker recommended that neither parent be offered family reunification services based on section 361.5 subdivision (b)(10)11), but that they continue to have reasonable and supervised contact with the children, who were in a confidential foster home. The two younger children tested positive for amphetamine and methamphetamine in their system but the older daughter tested negative.

In an interview with the social worker, Mother denied that she or father used drugs in front of the children. Mother admitted she started using methamphetamine at age 18, and used about 20 to 40 dollars worth of it about every two days. She had last used methamphetamine two days earlier. Mother claimed her methamphetamine use did not negatively affect her parenting as, under its influence, she paid more attention to the children and made sure they were fed and clean. She stated she had been diagnosed with attention deficit disorder, and she felt methamphetamine helped her stay calm and focused. Mother did not have an explanation for the children's positive drug tests.

Father told the social worker he began using methamphetamine at age 13. He described himself as a "functional meth user," who could attend to his children and provide for his family while under the influence of methamphetamine, which he used before and after the children's removal.

At the July 1, 2013, initial jurisdiction-disposition hearing, the court found Father was the presumed father of the three children. It ordered Agency to provide the parents with services, permitted them supervised visits with the children, and set the matter for trial.

4

The social worker's July 25, 2013 addendum report recommended that family reunification services not be offered to the parents because they had not followed through with voluntary services, including drug treatment services. Although the parents were ordered to maintain contact with Agency, they had not done so or even provided Agency their contact information. The parents had only visited the children twice since the children came into custody. At the end of one visit, Arianna was distraught at being separated from her parents. Agency recommended permanent placement that would provide the children a safe and stable home.

A social worker stated in a July 2013 addendum report that he met the parents on July 25, 2013, and they admitted they had not followed through with substance abuse services. They had both used methamphetamine two days earlier. The parents failed to complete an on-demand drug test, despite the social worker telling them that failure to do so would be deemed as a positive test result. A social worker supervised a visit between the parents and children and noted the children were happy to see the parents, and played with the parents. At the end of the visit, the children cried and screamed for the parents.

On August 6, 2013, the children were placed in the home of the children's maternal uncle, Johnny Gearhart. Agency's August 29, 2013 jurisdiction-disposition addendum stated that the parents were homeless, and a social worker was unable to reach them by telephone.

At an August 29, 2013 hearing, the court found by clear and convincing evidence that the maternal uncle was available, willing and able to care for the children, and it approved their placement with him. It terminated reunification services for parents, and

set a section 366.26 hearing. The court subsequently granted educational rights to the maternal uncle.

On November 27, 2013, Agency filed a report in connection with the section 366.26 proceedings, recommending the termination of parental rights and the children's adoption. Agency pointed out that the parents had visited the three children only five or six times since the children's June 2013 removal from the parents. Father had last visited them on September 6, 2013. Approximately one week later, he was arrested for battery of a spouse, possession of unlawful paraphernalia, and grand theft from a person. After that date, father spoke to the children by telephone approximately two times.

Mother had not visited the children from September 6, 2013 to November 9, 2013. She moved to Bakersfield, California on September 7, 2013, and spoke to the children by telephone approximately once a week. She gave birth to another child on October 30, 2013. Throughout that last pregnancy, Mother had used methamphetamine, and her newborn was released from the hospital into the care of Mother's relatives. Mother's sister was in the process of filing for guardianship of the newborn. Mother visited the children on November 10, 2013, and while they were happy to see her, they did not react when she left. Mother entered a drug rehabilitation program on November 11, 2013, and had not visited the children since that date.

In August 2013, Arianna and A. received full developmental evaluations at a hospital. The evaluator recommended that Arianna's behavior be monitored for attention problems and hyperactivity, and that she be enrolled in Head Start. A.'s language skills were weak, falling in the low average range, and her gross-motor skills were borderline.

She was referred to a speech and language therapist, and her uncle was in the process of setting up that appointment. Antonio had a developmental screening in June 2013, and the evaluator was concerned about his communication skills. The uncle reported the two girls were doing well in school, and Antonio was currently on the wait list for the Head Start Program. The girls' uncle reported their mental health had improved in the previous four months. However, Antonio was having problems with overeating and throwing tantrums over food, and his uncle was helping him with those problems.

The social worker concluded that the three children were specifically and generally adoptable. Specifically, they were already living with a "relative caregiver who is the maternal uncle. The maternal aunt, her husband, and their three children also live in the home and help the caregiver with the children." Further, the maternal uncle had met the children's needs over the past 14 months by taking them to all of their medical appointments and enrolling and taking Arianna and A. to and from school each day.

A November 2013 Agency report stated: "The agency acknowledges that there is in fact some level of strength in the relationship between [Mother] and the children as well as [Father] and the children[;] however, it does not appear to be significant enough to indicate detriment if parental rights are terminated." The report adds that the parents had exposed the children to many unhealthy situations, unstable environments, and domestic violence. The report concluded that if parental rights were terminated the emotional distress the children may experience would not outweigh the detriment of their spending additional years in the foster care system; moreover, adoption would provide them needed stability and permanence, which is critical for their development.

On January 22, 2014, Mother filed a request to change the court's order, made under section 361.5, subdivisions (b)(10) and (11), which had denied the parents reunification services and placed the children with their uncle. Mother claimed as changed circumstances that on November 11, 2013, she had enrolled in a faith-based drug treatment program, where she participated in daily group sessions addressing various topics, including substance abuse and anger management. She was also four sessions away from finishing a parenting class. She reported six months of sobriety. Mother claimed the children would be better placed with her because she had maintained consistent contact with them and had been visiting them weekly since returning from Bakersfield. She concluded the children would benefit from her demonstrating her commitment to providing them permanence and stability while also preserving the family unit.

Mother supported her petition with a January 23, 2014 letter from a representative of the drug treatment program, stating the program "is from twelve to eighteen months and we strongly recommend that [Mother] continues in our Drug Recovery Program. . . . [She] has taken three sessions of parenting classes, and at least two hours daily of personal growth/recovery classes." A January 22, 2014 forensic drug testing report showed Mother tested positive for opiates and codeine, but negative for amphetamines.

In a January 27, 2014 addendum report, Agency opposed Mother's section 388 petition, after considering three factors: The seriousness of the problem that lead to her drug dependency; the strength of the existing bond and the relationship between Mother and the children; and the degree to which the problem leading to her drug dependency

8

may be easily removed or ameliorated as well as the degree to which that had actually occurred. Agency observed that "[Mother] has abused substances the majority of her adult life and has directly exposed all [six] of her children to trauma related to her substance abuse." The social worker reported that since the children were brought into protective custody in June 2013, Mother's visitation had been inconsistent. Arianna had become tearful after one visit but later separated easily from Mother. During one visit, A. appeared "disorganized," first approaching Mother but then turning away or becoming distressed when Mother attempted to comfort her or hold her. At other times, A. accepted Mother's comfort and rested her head on Mother's shoulder. But at the end of the visits, A. separated easily from Mother. According to A.'s uncle, since the visits with Mother had resumed, A.'s behavior at school had changed. Further, A. had a more difficult time separating from her uncle when he took her to school, and she was disinterested in school activities. Antonio appeared happy to see Mother and enjoyed playing with her during the visits but was not distressed at the end of visits and easily separated from her. Antonio frequently engaged in dangerous behavior during visits and oftentimes Mother was unaware, which frequently required the social worker's intervention. Mother was unable to safely care for all three of the children.

Finally, the social worker called into question Mother's claim that she had been sober for six months, noting that the rehabilitation program did not conduct drug tests. The social worker also stated: "While it appears [Mother] is doing well in her program, it also appears as though the services she is receiving through the program are minimal. Most significantly, [Mother] has a substance abuse history that is approximately 10 years

9

long and she has only recently begun to participate in services. [Mother] is still at the very beginning stages of recovery and the problem that lead to the children's dependency is only at the beginning stage of being addressed."

The social worker described three visits she supervised between Father and the children in January 2014. In the first visit on January 3, "Arianna asked a few times where her mommy was or if she was coming. [Father] did not respond and at one point she asked him, 'Are you and Mommy fighting daddy?' [Father] then responded 'No we aren't fighting, why you say that?' " The social worker noted: "Throughout the visit [Antonio] frequently brought toys to me and asked to sit on my lap." Father tried to tickle A. and throw her in the air to make her laugh but she whined, flailed and was upset. For the last 30 minutes of the visit, she was difficult to sooth. Father spent the majority of the visit attempting to entertain her and improve her mood. A. appeared unsure whether she wanted Father's attention or not. Near the end of the visit, A. and Antonio started crying. When the social worker picked her up, A. stopped crying. The social worker noted the children did not cry or appear distressed when leaving Father. When the children arrived home, they began to play.

In the second visit on January 9, Antonio twice fell and hit his lip. At other times, Antonio risked injuring himself by walking on the edge of a couch, climbing on a shopping cart and on a rocking chair. Only after the social worker moved to protect him did Father react to those instances. A. was "unsettled and fussy" for most of the visit. The children separated easily from Father.

The social worker reported that during the January 21 visit, as in the other visits, Father played with the children and took photos and videos of them with his cell phone. At one point, Father noticed Antonio needed a diaper change and took care of that. "Several times A. tried to climb up a slide. [Father] noticed about half of the time and took her off. While riding a bike around Arianna ran her head into a pole." Antonio cried at the end of the visit, but he stopped shortly afterwards.

At a January 30, 2014 proceeding, the court first addressed Mother's section 388 petition, which Agency opposed on grounds she had not presented sufficient evidence of changed circumstances or best interests of the children. The court denied Mother's petition, noting she had not made a prima facie showing of changed circumstances: "I can't find that the facts or the information alleged, even if they were supported by admissible evidence, would lead to a favorable outcome on the petition. [¶] And the major concern of the court, first of all is the failure to establish even allegations of changed circumstances. This is the third dependency, as was noted, for [Mother]." The court noted Mother had been enrolled in the drug rehabilitation program for only a brief time, and much less than the program's intended duration. The court noted it could not even find there were changing circumstances, much less changed circumstances regarding Mother's substance abuse problem. Therefore, the court declined to hold an evidentiary hearing on the petition.

The court immediately proceeded to conduct a hearing under section 366.26. Mother testified on direct examination that she had been visiting the children weekly, they recognized her as their mother, and looked to her for their needs. She telephoned

11

them every other week as allowed during her drug rehabilitation program. On cross-examination, Mother agreed that during the visits she had had difficulty supervising the three children at the same time. Agency pointed out that Mother's weekly visits had started only four weeks earlier.

The parents claimed they had satisfied the parent-child bond exception to adoption and should be allowed guardianship of the children. However, the court adopted Agency's recommendation and terminated parental rights, finding by clear and convincing evidence it was likely the children would be adopted if parental rights were terminated, and the parents had not met their burden of showing any exception to adoption. The court reasoned the parents' visits were inconsistent and interrupted by Father's incarceration and Mother's move to Bakersfield. The court also summarized the evidence regarding the quality of the visits: "Mother had a good time. She was a playmate of the children. There are repeated references to the social worker's needing to intervene to keep . . . the children safe." The court stated that although a bond existed between Mother and the children, "[t]here are limits to the Mother's ability to meet the needs of the children, and the bond is not such, according to the evidence before the court, that the children will be substantially harmed by loss of this bond. [¶] As to the Father, there's minimal evidence of a bond, let alone any injury that the children will suffer if the bond is terminated."

## DISCUSSION

### I. *Denial of Section 388 Petition*

12

Mother contends the juvenile court abused its discretion by denying her section 388 petition despite the fact she presented substantial evidence of changed circumstances including her enrollment in a drug treatment program, where she participated in daily group sessions addressing topics like substance abuse and anger management. She points out she also participated in parenting classes, reported six months of sobriety, and in January 2014, had a month of weekly visits with the children.

A. *Legal Principles and Standard of Review*

Section 388 allows a parent of a dependent child to petition the court "to change, modify, or set aside any order of court previously made . . . ." (§ 388, subd. (a)(1).) On such a modification petition, the juvenile court must determine whether the parent has demonstrated by a preponderance of the evidence both that there was new evidence or a change of circumstances and that it would promote the child's best interests to change, modify or set aside the previous order. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) " '[I]t is not enough for [the petitioner] to show *just* a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; see *In re D.B.* (2013) 217 Cal.App.4th 1080, 1094 [party moving under section 388 cannot simply rely on new evidence that may often arise under the passage of time; rather, the party must show that the change in the order will be in the minor's best interests].)

Further, the petition must show changed, not changing, circumstances. (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *In re Casey D.*, *supra*, 70 Cal.App.4th at pp.

13

45-47.)  And "[n]ot every change in circumstance can justify modification of a prior order.  [Citation.]  The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate.  [Citations.]  . . .  The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order."  (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

The juvenile court's decision on the petition is addressed to its sound discretion and will not be disturbed on appeal in the absence of a clear abuse.  (*In re Jasmon O.*, *supra*, 8 Cal.4th at pp. 415-416.)  Under this standard, we do not reverse unless the court's decision exceeds the limits of legal discretion by being arbitrary, capricious, or patently absurd.  (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.)  " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*In re Stephanie M.*, at p. 319; *In re J.C.* (2014) 226 Cal.App.4th 503, 525-526.)

B.  *Analysis*

Applying the foregoing principles, we cannot say the juvenile court abused its broad discretion in finding Mother had not demonstrated sufficiently changed circumstances to justify modification of the prior order.  Taking into account Mother's long-standing drug habit, she had spent only a few months in the drug rehabilitation program.  Even the program representative's recommended stay for Mother was between twelve and eighteen months.  While in the program, Mother had tested positive for

14

codeine. We conclude that Mother's efforts to improve herself and become a better parent, while commendable, at the most showed the beginning of changing circumstances; but did not show the required changed circumstances. The changes she was beginning to make were not enough to warrant a modification of the court's order.

Nor can we conclude the juvenile court erred by ruling Mother had not demonstrated that an order giving her custody was in the children's best interests. "To understand the element of best interests in the context of a [section] 388 petition filed . . . on the eve of the [section 366.26] hearing, we turn to the Supreme Court's language in *In re Stephanie M.*, *supra*, 7 Cal.4th 295 . . . : '[A]t this point "the focus shifts to the needs of the child for permanency and stability" [citation] . . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' " (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 526.)

Mother did not show the change she requested was in the children's best interests. Her argument that the children would benefit from her demonstrating her commitment to providing them permanence and stability while also preserving the family unit is without basis. At the time of the hearing, Mother had resumed visitations with the children for approximately four weeks, after an irregular pattern of previous visits. Mother admitted that she was unable to care for all three children at the same time during the visits. The children did not have a hard time separating from her at the end of the visits. These instances indicated Mother did not make a significantly beneficial contribution to the children's well-being. By contrast, the evidence established that the children had a stable

15

placement with their maternal uncle.  After the children were evaluated medically, their uncle followed up to ensure they saw the professionals recommended to address their particular problems.  He also enrolled them in educational programs and monitored their progress.

II. *The Juvenile Court Properly Concluded Mother Failed to Establish the Parental Benefit Exception to Adoption*

A.  *Legal Principles*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 50.)  "If the dependent child is adoptable, there is strong preference for adoption over the alternative permanency plans."  (*In re S.B.*, at p. 297; *In re Michael G.* (2012) 203 Cal.App.4th 580, 588.)

In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)  The court, "in *exceptional circumstances*," may "choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances:  [¶]  . . . The parents have maintained regular visitation and contact with the child *and* the child would benefit

16

from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)  "The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' "  (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 528-529; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  The parent asserting the exception has the burden of proving it by a preponderance of the evidence.  (*In re J.C.*, at p. 529.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.  (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  The latter determination "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . ."  (*In re J.C.*, at p. 531.)

17

B. *Substantial Evidence Supports the Juvenile Court's Finding that Mother Did Not Engage in Regular Visitation and Contact with the Children.*

The record shows Mother visited the children sporadically before she spent two months in Bakersfield, during which time she did not visit them. Following her return, she visited the children briefly, but entered a substance abuse program, and did not visit them for approximately two months. At the time of the court's ruling, Mother had only recently resumed weekly visits with the children. This court has made clear that sporadic visitation is insufficient to satisfy this prong of the beneficial relationship exception. (*In re C.F.* (2011) 193 Cal.App.4th 549, 554.)

C. *The Juvenile Court Did Not Abuse its Discretion in Finding the Benefit of Maintaining the Parent-Child Relationship Did Not Outweigh the Benefit of Adoption*

Mother contends she demonstrated it was in children's best interests to continue their relationship with her, referring to evidence that the children cried at the end of her visits with them. She also described one particular visit: "[She] was affectionate with the children, and all three hugged her on her arrival. In addition, the children and [M]other played and laughed. [She] told the children she loved them and asked them for kisses."

To meet this prong of the exception, Mother "must show more than frequent and loving contact or pleasant visits," but that she "occupies a parental role" in the children's life. (*In re C.F.*, *supra*, 193 Cal.App.4th at pp. 555, 558-559; *In re Mary G.* (2007) 151 Cal.App.4th 184, 207.) As we have stated, Mother must show her "relationship promotes the well-being of [the children] to such a degree as to outweigh the well-being [they] would gain in a permanent home with new, adoptive parents. In other words, the court

18

balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Additionally, Mother must not only demonstrate the positive aspects of her relationship with the children, but "must show [they] would suffer detriment if [their] relationship with the parent were terminated." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.)  Indeed, severing of the relationship must " 'deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)  Mother " 'may not derail an adoption merely by showing [the children] would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' " (*Ibid.*)

Substantial evidence supported the court's finding the children were specifically and generally adoptable, and Mother did not sustain her burden to show the beneficial parent-child exception applied to prevent terminating her parental rights.  Although the children bonded with her, the court found based on the social worker's report that Mother was more like a playmate than a parent to them.  The children separated easily from her at the end of the visits.  The maternal uncle reported that after the children's visits with Mother resumed, A. started having emotional and academic problems.  Finally, in the case of Antonio, as a one-year old, he tended to get in dangerous situations that Mother

was inattentive to, thus requiring the social worker's intervention. We conclude that Mother failed to rebut the presumption that continued placement with their caretakers was in the children's best interest.

### III. *Father's appeal*

Father concedes that his "desire to reunify with his children was obviously at odds with his drug addiction, and [he] was unable to couple his actions with his intent in a manner sufficient to justify placement with him," but contends that "there was enough of a beneficial relationship between [him] and the children to justify a lesser permanent plan, such as guardianship." He argues that he had maintained regular visitation with the children as much as circumstances allowed, and they were bonded with him, pointing out they screamed and clinged to him at the end of his visits.

Under the applicable law set forth above, Father did not meet his burden of showing the beneficial parent-child exception applied to prevent terminating his parental rights under section 366.26. Father's visits with the children were not regular. The visits were interrupted by his approximately four-month incarceration. When the visits resumed in January 2014, Father spent some fun moments playing with the children, but there were also difficulties. The social worker reported one daughter hit herself while riding a bicycle, and Father was not attentive enough to prevent Antonio from getting injured more than once during a particular visit. And more than once the social worker had to alert Father that Antonio was at risk of further harming himself. In his visits with the children, Father did not form a bond sufficiently strong to outweigh the benefits the

20

children would gain from their placement in a permanent home with new, adoptive parents.

## DISPOSITION

The orders are affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

AARON, J.